**Slip Op. 04-46**

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————

TA CHEN STAINLESS STEEL PIPE, LTD.,

       *Plaintiff*,

       v.

UNITED STATES,

       *Defendant*,

       and

ALLOY PIPING PRODUCTS, INC., ET AL.,

       *Defendant-Intervenors.*

———————————————————————

ALLOY PIPING PRODUCTS, INC.,
FLOWLINE DIVISION, MARKOVITZ
ENTERPRISES, INC., GERLIN, INC. and
TAYLOR FORGE STAINLESS, INC.,

       *Plaintiffs*,

       v.

UNITED STATES,

       *Defendant.*

———————————————————————

Consolidated
Court No. 01-00027

[Final Results of U.S. Department of Commerce's administrative review of antidumping duty order remanded for further action consistent with this opinion.]

Decided: May 4, 2004

Miller & Chevalier Chartered (Peter J. Koenig and Kristen Smith), for Plaintiff Ta Chen Stainless Steel Pipe, Ltd.

Collier Shannon Scott, PLLC (David A. Hartquist and Jeffrey S. Beckington), for Plaintiffs/Defendant-Intervenors Alloy Piping Products, Inc., *et al*.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Lucius B. Lau); Berniece A. Browne, Senior Counsel, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant United States.

**OPINION**

RIDGWAY, Judge:

This consolidated appeal contests the final results of the administrative review of the antidumping duty order covering certain stainless steel butt-weld pipe fittings from Taiwan, conducted by the U.S. Department of Commerce for the period of June 1998 through May 1999. *See* Final Results of Antidumping Administrative Review: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 65 Fed. Reg. 81,827 (Dec. 27, 2000) ("Final Results"), adopting the Issues and Decision Memorandum (Dec. 15, 2000), Pub. Doc. 105 ("Decision Memo").

Jurisdiction is predicated on 28 U.S.C. § 1581(c) (1994).[1] The Commerce Department's findings, conclusions and determinations in the Final Results must be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

---

[1] All statutory citations are to the 1994 version of the U.S. Code. However, the pertinent text of the cited provisions remained the same at all times relevant herein.

Pending before the Court are two motions for judgment on the agency record, both of which challenge certain aspects of the Final Results.

Ta Chen Stainless Steel Pipe, Ltd. ("Ta Chen") – a Taiwanese producer and exporter of fittings subject to the antidumping duty order and the administrative review here at issue – is the plaintiff in one of the two cases consolidated into this action. Ta Chen's Motion for Judgment on the Agency Record contests the Commerce Department's determination that Ta Chen had agreed to reimburse its U.S. importer for antidumping duties – a determination which caused the agency to double Ta Chen's dumping margin. *See* Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Agency Record ("Ta Chen Brief") at 5-22. In addition, Ta Chen disputes the Commerce Department's calculation of profit for the company's constructed export price ("CEP") sales, as well as the agency's decision to deny the company a CEP offset adjustment. Ta Chen Brief at 22-33, 33-39. Ta Chen concludes that – if the asserted agency errors are corrected – Commerce Department regulations require that the antidumping duty order against it be revoked, because the company's dumping margin falls to 0% for the period of review at issue here, and because the company has not been found to be dumping in prior years. Ta Chen Brief at 39-40; 19 C.F.R. § 351.222(b) (2000).[2]

The other pending motion was filed by four domestic fittings producers (the "Domestic Producers") who commenced their own action challenging the Final Results, which was consolidated

---

[2]All citations to agency regulations are to the 2000 version of the Code of Federal Regulations. However, the pertinent text of the cited provisions remained the same at all times relevant herein.

with Ta Chen's case (in which they appear as Defendant-Intervenors).[3]  The Domestic Producers'

motion is much more limited, challenging only the Commerce Department's choice of financial

statements used to calculate U.S. indirect selling expenses.  The Domestic Producers charge that the

data used by the agency understate those expenses and, thus, the Final Results understate Ta Chen's

dumping margin.  *See* Domestic Producers' Memorandum of Law in Support of Motion for

Judgment on the Agency Record ("Dom. Prod. Brief") at 9-21; Defendant-Intervenors' Reply to

Defendant's Memorandum in Partial Opposition to the Motions for Judgment Upon the Agency

Record Filed by Plaintiff and Defendant-Intervenors ("Dom. Prod. Reply Brief") at 4-12.

Defendant, the United States ("the Government"), contends that the Final Results should be

sustained in all respects, save one.  Thus, the Government – joined by the Domestic Producers – urge

that the reimbursement issue be remanded to the Commerce Department, and that Ta Chen's motion

be denied in all other respects.  *See* Defendant's Memorandum in Partial Opposition to the Motions

for Judgment Upon the Agency Record ("Gov't Brief") at 32-34 (urging remand on reimbursement

issue), 18-32, 34-55; Response of Defendant-Intervenors to Ta Chen Stainless Pipe Co., Ltd.'s

Motion for Judgment on the Agency Record ("Dom. Prod. Response Brief") at 2 n.2 (urging remand

on reimbursement issue), 8-32.  And the Government asserts that the Domestic Producers' motion

should be denied in its entirety.  Gov't Brief at 55-61.

For the reasons set forth below, the Domestic Producers' motion is denied.  Ta Chen's

motion is granted in part, and this action is remanded to the Department of Commerce for

---

[3]The Domestic Producers – Alloy Piping Products, Inc.; Flowline Division, Markovitz Enterprises, Inc.; Gerlin, Inc.; and Taylor Forge Stainless, Inc. – were the four domestic petitioners in the administrative review here at issue.

reconsideration of its determinations on the alleged reimbursement agreement and the calculation of constructed export price ("CEP") profit.

## I. **Background**

### A. The Legal Framework

Dumping takes place when goods are imported into the U.S. and sold at a price lower than their "normal value" – *i.e.*, the foreign market value of the goods. 19 U.S.C. §§ 1673, 1677(34). The difference between the normal value and the U.S. price is the "dumping margin." 19 U.S.C. § 1677(35); *See generally* Antidumping Manual, Chap. 6 at 1-2 (Dept. of Comm., Jan. 22, 1998) ("AD Manual"). When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin may be imposed. 19 U.S.C. § 1673(2)(B).

Normal value is calculated using the exporting market price (*i.e.*, the market where the goods are produced), an appropriate third country market price, or the cost of production of the goods. 19 U.S.C. § 1677b. The U.S. price is calculated in one of two ways – export price ("EP") or constructed export price ("CEP") – depending on the relationship between the producer or exporter and the U.S. purchaser. 19 U.S.C. § 1677a. Where the U.S. purchaser is unaffiliated with the producer or exporter, the U.S. price is based on the export price (EP) (*i.e.*, the transaction price). 19 U.S.C. § 1677a(a). Where the U.S. purchaser is affiliated with the producer or exporter, the U.S. price is based on the first sale from the affiliated purchaser to an unaffiliated purchaser in the U.S. This is the basis for constructed export price (CEP). 19 U.S.C. § 1677a(b).

Because the sale prices used to determine normal value and the U.S. price (either EP or CEP), occur at different points in the chain of commerce, and under different circumstances, certain

adjustments are made to attempt to make them comparable.  For example, packing expenses, duties and taxes, and shipping and handling costs may affect normal value and the U.S. price differently, and therefore could preclude the fair comparison of prices, distorting the dumping margin.  Thus, at least in theory, adjustments to account for such costs ensure "apples to apples" price comparisons.

Certain other special adjustments are made when the price to be calculated is CEP.  Among these are adjustments to account for selling expenses incurred in the U.S. by the entity affiliated with the foreign producer or exporter, such as commissions, guarantees and warranties, and credit expenses.  19 U.S.C. § 1677a(d)(1).

### 1. CEP Profit

In addition to the adjustments for selling expenses, the CEP is reduced to account for the portion of profit attributable to those selling expenses.  19 U.S.C. § 1677a(d)(3).  In calculating this CEP profit adjustment, the Commerce Department determines the "total actual profit" earned on all sales, foreign and domestic, of the subject goods.  19 U.S.C. § 1677a(f)(2)(D).  To that end, the agency calculates the "total expenses," foreign and domestic, incurred in the production and sale of the goods.  *See* 19 U.S.C. § 1677a(f)(2)(C).  Total profit is what remains once expenses are subtracted from revenue.  *See* Ausimont SPA v. United States, 25 CIT___,___, 2001 WL 1230596 at *20 (2001).

To calculate the portion of profit attributable to U.S. selling expenses – *i.e.*, the CEP profit – the total actual profit figure is multiplied by the "applicable percentage."  19 U.S.C.§ 1677a(f)(1). This  statutorily governed figure is arrived at by dividing the "total U.S. expenses" – the selling

expenses incurred in the U.S.[4]– by the "total expenses." 19 U.S.C. § 1677a(f)(2). Thus, the amount

of total profit to be designated as U.S. profit is based on the ratio of U.S. expenses to total expenses.

This calculation may be expressed as an equation:

$$\text{Total profit allocated to U.S. expenses} = \text{Total Actual Profit} \times \frac{\text{Total U.S. Expenses}}{\text{Total Expenses}}$$

### 2. Level of Trade/CEP Offset

The Commerce Department also must make adjustments to the CEP to account for any

differences in the "level of trade" ("LOT") between the exporting market and the U.S. market that

affect the comparability of prices. 19 U.S.C. § 1677b(7)(A). Differences in LOT occur where, for

example, the sales in the foreign market are made at different marketing stages from the U.S. market,

such that there is a "difference in the actual functions performed by the sellers" in each market.

Statement of Administrative Action for the Uruguay Round Agreements Act of 1994, H.R. Doc. No.

103-316 at 829 (1994) ("SAA"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4167; 19 C.F.R. §

351.412(c)(2).

A special adjustment called the "CEP offset" must be made when the agency determines that

the LOT of the exporting market (*i.e.*, normal value) is at a more advanced stage of distribution than

the LOT of the U.S. market (*i.e.*, constructed export price), and that – despite the best efforts of the

producer or exporter – the available data do not provide an adequate basis upon which to determine

whether the difference in the levels of trade affects the comparability of prices. 19 U.S.C. §

---

[4]In some circumstances, other expenses not relevant here may also be included in "total U.S. expenses." *See* 19 U.S.C. § 1677a(f)(2)(B).

1677b(a)(7)(B); 19 C.F.R. § 351.412. In such cases, the agency reduces normal value by the amount of indirect selling expenses for the goods at issue in the foreign market, capped by the amount of indirect expenses used in determining constructed export price (in the U.S. market). *Id.*

## B.  The Facts of This Case

Ta Chen is a Taiwanese producer and exporter of stainless steel butt-weld pipe fittings subject to an antidumping duty order dating from 1993.[5] *See* Amended Final Determination and Antidumping Duty Order: Certain Welded  Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 58 Fed. Reg. 33,250 (June 16, 1993).  Ta Chen sells its fittings to its U.S. subsidiary, Ta Chen International ("TCI"), located in California.  TCI, in turn, sells the fittings to unaffiliated U.S. customers.  Non-Pub. Doc. 1.  As the importer of record, TCI is responsible for any duties on the fittings.

At the request of both Ta Chen and the Domestic Producers (who were petitioners in the proceedings before the agency), the Commerce Department conducted an administrative review of the antidumping order for the period of June 1, 1998 through May 31, 1999.  Pub. Docs. 2, 3.[6]  In

---

[5]Stainless steel butt-weld pipe fittings are manufactured in a variety of shapes, including elbows, tees, reducers, stub-ends and caps.  They are widely used in piping systems subject to, for example, high pressure or extreme temperatures, and in systems where contamination and/or corrosion are concerns.  Final Results at 81,828.

[6]The administrative record in this case consists of two sections, designated "Public" and "Business Proprietary," respectively. The "Public" section consists of copies of all documents in the record of this action, with all confidential information redacted. The "Business Proprietary" section consists of complete, unredacted copies of only those documents that include confidential information.

the preliminary results of that review, the Commerce Department determined that all of Ta Chen's

U.S. sales should be classified as constructed export price ("CEP") sales, because all of the

company's sales to unaffiliated buyers occurred in the United States, between Ta Chen's subsidiary

TCI and U.S. customers. *See* Preliminary Results of Antidumping Duty Review and Intent To Not

Revoke in Part: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 65 Fed. Reg. 41,629,

41,630-31 (July 6, 2000) ("Preliminary Results").

Because all of Ta Chen's sales were classified as CEP sales, certain additional adjustments

to the sales prices were required, to account for the selling expenses and profit incurred by TCI. *See*

*generally* 19 U.S.C. § 1677a(d); section I.A, *supra*. However, because the Commerce Department

found that "the [level of trade] in the home market [*i.e.*, Taiwan] matched the [level of trade] of the

CEP transactions [*i.e.* the U.S. sales]," the agency did not make a CEP offset adjustment to normal

value. Preliminary Results at 41,632; 19 U.S.C. § 1677b(a)(7)(B).

After conducting verifications of Ta Chen's data in Taiwan and in California, the Commerce

Department issued its verification reports. Non-Pub. Docs. 41, 43. Thereafter, Ta Chen and the

Domestic Producers filed their administrative case briefs with the agency. The Domestic Producers'

case brief disputed, *inter alia*, the agency's calculation of U.S. indirect selling expenses using TCI's

October 31, 1998 income statement (rather than the 1999 statement). *See* Non-Pub. Doc. 46 at 6.

---

Citations to documents in the "Public" section of the administrative record are noted as "Pub. Doc. \_\_\_\_." Citations to documents in the "Business Proprietary" section are noted as "Non-Pub. Doc. \_\_\_\_." All page numbers refer to the original, internal pagination of the documents.

Ta Chen's case brief challenged the Commerce Department's CEP profit calculation, but made no mention of the agency's decision to deny Ta Chen a CEP offset adjustment to normal value. *See* Non-Pub. Doc. 45.

Several weeks after the parties' case briefs were filed, the Commerce Department extended the deadline for completion of the administrative review, to allow it to address "a new issue on which interested parties [had] not had the opportunity to comment." Pub. Doc. 89. The Department asserted that its examination of various financial statements submitted by Ta Chen and TCI evidenced an agreement under which "the president of Ta Chen and TCI has agreed to reimburse TCI for dumping duties" imposed on Ta Chen's fittings, although the agency conceded that "such reimbursement may not have yet taken place." Pub. Doc. 90. *See generally* Notice of Postponement of Final Results of Antidumping Duty Administrative Review:  Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 65 Fed. Reg. 67,348 (Nov. 9, 2000).

Ta Chen filed comments with the Commerce Department responding to the agency's allegations. Pub. Doc. 92. But the company's submission was rejected because it also addressed the Department's decision to deny the company a CEP offset adjustment – an issue beyond the scope of the agency's request for comments. Pub. Doc. 95. In addition, the agency objected to Ta Chen's inclusion of "untimely new factual information" relating to the reimbursement issue. Pub. Doc. 96. That information included documentary evidence which, according to Ta Chen,  proves that there was no agreement to reimburse TCI and that there had been no reimbursement of TCI's antidumping

duties during the period of review.  *See* Non-Pub. Doc. 49.  Ta Chen filed a revised submission, deleting all discussion of the CEP offset issue, and omitting the documents supporting its arguments on the issue of reimbursement.  Non-Pub. Doc. 51.

The Final Results published by the Commerce Department found that evidence pointing to a reimbursement agreement dating from 1992 to 1994 raised "a rebuttable presumption that the agreement [was] still in effect during [this period of review]."  Decision Memo at 9.  The agency therefore concluded that the dumping margin assigned to Ta Chen should be doubled.  Decision Memo at 12.

The Final Results also rejected Ta Chen's request that the Commerce Department make certain adjustments for imputed credit and inventory carrying costs in calculating CEP profit. Reviewing Policy Bulletin 97.1 (which explains the agency's methodology for such calculations), the Commerce Department stated that it does not include imputed interest in the calculation of CEP profit because it already accounts for actual interest.  Decision Memo at 25-26.  Referring to the policy bulletin, the agency further stated that accepted accounting principles only permit the deduction of actual booked expenses – not imputed expenses – in determining profit.  *Id*.

Finally, in calculating U.S. indirect selling expenses, the Commerce Department continued to rely on the figures in TCI's October 31, 1998 income statement, rather than the October 31, 1999 statement urged by Domestic Producers.  Decision Memo at 28.  Explaining that it prefers "to utilize *actual, verified* data for . . . final results," the Department pointed out that the figures in TCI's 1998 statement had been verified by the agency, and that the Domestic Producers' proposed calculation "incorporate[d] an *estimate* of the antidumping legal fees and Section C expenses reported elsewhere

for the fiscal year ending October 31, 1999." Decision Memo at 29 (emphasis added). In addition, the agency stated that "[b]asing [U.S. indirect selling expenses] on the 1998 fiscal year data is . . . consistent with the Department's use of the verified 1998 fiscal year data for Ta Chen's G&A [general and administrative] and interest expenses." Decision Memo at 29.

The Final Results were challenged by Ta Chen, as well as the Domestic Producers, in two separate appeals, which were consolidated into this action.

## II. Analysis

### A. The Determination on Reimbursement

The Commerce Department's regulations contemplate that, in certain cases, antidumping duties may be imposed that exceed the actual dumping margins found. Where the Commerce Department finds that an exporter or producer either paid antidumping (or countervailing) duties directly on behalf of the importer or reimbursed the importer for such duties, the regulations provide that the amount of the payment is to be deducted from the export price or constructed export price. 19 C.F.R. § 351.402(f). This effectively increases the dumping margin by lowering the U.S. price (*i.e.*, the export price or constructed export price), thus increasing the difference between the U.S. price and normal value.

As discussed in section I.B above, the Final Results here at issue found that evidence of a reimbursement agreement dating from 1992 to 1994 raised "a rebuttable presumption that the agreement [was] still in effect during [this period of review]." Decision Memo at 7-8. Relying on its reimbursement regulation, the Commerce Department therefore doubled the dumping margin

assigned to Ta Chen.  Decision Memo at 9.  Ta Chen attacks the agency's reimbursement determination on evidentiary, procedural, and legal grounds.  *See generally* Ta Chen Brief at 5-22.

First, Ta Chen argues that the agency's reimbursement determination is unsupported by *any* evidence, much less "substantial evidence."  *See generally* Ta Chen Brief at 5-12.  Ta Chen argues, *inter alia*, that the mere existence of an agreement by the president of Ta Chen and TCI to reimburse TCI for antidumping duties incurred from 1992 through 1994 cannot constitute evidence that reimbursement occurred during this period of review.  *See* Ta Chen Brief at 6.  Ta Chen points to its certified statement, submitted to the agency, attesting to the absence of any reimbursement agreement covering this period of review.  *See* Ta Chen Brief at 7 (*citing* Non-Pub. Doc. 49).  Ta Chen emphasizes that the Commerce Department itself determined – in the administrative review following the review at bar – that the reimbursement agreement on which the agency here relies "was limited solely to the 1992-1994 [periods of review]."  Ta Chen Brief at 7 (*quoting* Preliminary Results of Antidumping Administrative Review: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 66 Fed. Reg. 36,555, 36,559 (July 12, 2001)).

Second, Ta Chen asserts that – as a matter of procedure – the Commerce Department abused its discretion when it rejected the documentary evidence proffered by the company to prove that there was no reimbursement agreement and that TCI's antidumping duties had not been reimbursed during the relevant period of review.  Ta Chen argues that the agency failed to even raise the reimbursement issue until very late in the proceeding, and then unreasonably denied the company the opportunity to present evidence on the issue on the ground that the evidence was "untimely."  Ta Chen Brief at 12-13.  Ta Chen concludes that – although the Commerce Department stated that its determination

was based on a *rebuttable* presumption that the earlier reimbursement agreement continued in effect during the period of review – the agency in fact imposed an illegal, *irrebuttable* presumption, by denying Ta Chen the opportunity to present contradictory evidence. Ta Chen Brief at 14-16.

Finally, Ta Chen challenges – as a matter of law – the validity of the reimbursement regulation itself. Specifically, Ta Chen contends that, because the regulation authorizes the imposition of antidumping duties in excess of the dumping margins actually calculated, the regulation contravenes the U.S. antidumping statute, as well as the United States' international obligations. According to the company, under both domestic and international law, dumping duties may offset only the amount of any dumping, and no more. Ta Chen Brief at 20-22.

The Government mounts a vigorous defense of the legality of the Commerce Department's reimbursement regulation, arguing – in short – that the regulation is a reasonable interpretation of the antidumping statute that has been endorsed at least implicitly (if not explicitly) by Congress. *See* Gov't Brief at 19-32.[7] However, even the Government now concedes that Ta Chen was "denied a meaningful opportunity to rebut [the Commerce Department's] presumption of reimbursement [as a result of] the agency's decision to reject the factual information Ta Chen attempted to submit . . . ." Gov't Brief at 13. The Government – joined by the Domestic Producers – therefore urges that the reimbursement issue be remanded to the Commerce Department, and that "the Court . . . defer ruling upon the question whether Commerce's finding of reimbursement is supported by substantial

---

[7]In their briefs filed with the Court, the Domestic Producers take no position on the legality of the reimbursement regulation. *See* Dom. Prod. Response Brief, *passim*.

evidence and otherwise in accordance with law pending the results of the remand." Gov't Brief at

32-34; Dom. Prod. Response Brief at 2 n.2.

Considerations of judicial economy and judicial restraint counsel remand where, as here, that

course may moot a significant legal issue – in this case, the legality of the reimbursement regulation.

On remand, the Commerce Department shall reconsider the bases for its determination concerning

the alleged reimbursement agreement, in light of any relevant factual evidence, as well as the

agency's own findings, conclusions, and determinations in other matters (including its determination

– in the administrative review following the review at bar – that the reimbursement agreement on

which it here relies was limited solely to the 1992-1994 periods of review), and the applicable law.[8]

---

[8]The Government argues, in essence, that the reimbursement regulation is a legitimate exercise of the Commerce Department's authority under the statute to promulgate implementing regulations. But the matter is not as open-and-shut as the Government suggests.

The Government's argument implicitly assumes that the antidumping statute is, on its face, silent on the imposition of duties that exceed the actual amount of dumping. However, the statute expressly authorizes the Commerce Department to impose antidumping duties "in an amount equal to the amount by which normal value exceeds the export price (or the constructed export price) of the merchandise" (*i.e.*, in an amount equal to the dumping margin) – language that can easily be read to *preclude* the imposition of duties that *exceed* the dumping margin. 19 U.S.C. § 1673a(1)(B). Moreover, the statutory scheme addresses in detail the agency's calculation of normal value, export price, and constructed export price, including the adjustments to be made in those calculations. Indeed, the statute specifically enumerates – in lists that appear to be exhaustive, rather than merely illustrative – those adjustments that the agency is authorized to make. *See* 19 U.S.C. §§ 1677a, 1677b. Nowhere in the statute is there language authorizing an adjustment to normal value, export price, or constructed export price, to account for the reimbursement of dumping duties to an importer.

Recent developments – in Congress, in the courts, and before the World Trade Organizations – may also bear on the legality of the Commerce Department's reimbursement regulation (raising issues such as whether the imposition or distribution of duties in excess of the actual dumping margin effectively converts the remedial antidumping regime into a punitive scheme).

B.  The Calculation of CEP Profit

In determining Ta Chen's constructed export price (CEP), the Commerce Department was required to calculate the percentage of profit attributable to the U.S. selling expenses of Ta Chen's subsidiary, TCI.  As discussed in section I.A above, CEP profit is determined by multiplying total actual profit by the ratio of total U.S. expenses to total expenses.

In applying the statutory equation in this case, the Commerce Department calculated "total actual profit" by totaling the profit for all subject fittings sold in the U.S. and in the exporting market, reflecting only *actual, booked expenses* – that is, imputed credit and inventory carrying costs were not included.  Imputed credit and inventory carrying costs were excluded as well in calculating the "total expenses" denominator of the statutory ratio.  In contrast, the same imputed credit and inventory carrying costs were *included* in "total U.S. expenses," the numerator of the statutory ratio. *See* Gov't Brief at 34-35.[9]

Ta Chen attacks the Commerce Department's calculation of the CEP profit adjustment as unsupported by substantial evidence and otherwise not in accordance with law.  *See generally* Ta Chen Brief at 22-33.  Ta Chen argues that the Department's CEP profit calculation resulted in an overstatement of the company's profit deduction, thus significantly increasing its dumping margin. Ta Chen faults the agency for, *inter alia*, failing to include imputed credit and inventory carrying

_____

[9] Imputing credit costs is based on the time value of money.  Thus, for example, where goods are warehoused for longer periods prior to sale, the opportunity cost is higher than where the seller receives payment soon after production.  Similarly, where a seller extends longer terms of payment, greater credit expenses are incurred.  These expenses are usually incorporated into the price of the goods.  *See*, *e.g.*, Import Administration Policy Bulletin 98.2 (Feb. 23, 1998).

costs in both the "total actual profit" and "total expenses" portions of the CEP profit calculation. Ta Chen asserts that the Commerce Department essentially "ignored[d] enormous . . . inventory carrying and credit costs," making U.S. sales appear overly profitable in comparison to home market sales. Ta Chen Brief at 25.

The Government and the Domestic Producers dispute Ta Chen's charges, and urge that the Commerce Department's CEP profit calculation be sustained. *See generally* Gov't Brief at 34-46; Def. Prod. Response Brief at 19-32. The Government dismisses Ta Chen's claim that the methodology used to calculate the CEP profit adjustment distorted the CEP profit allocation, and maintains that the methodology here was consistent with established agency practice. Gov't Brief at 38-40.

The Government asserts that the financial data used to calculate "total actual profit" already include "net interest expenses" (*i.e.*, actual interest expenses) and thus "there is no need to include imputed interest in determining total profit." Gov't Brief at 39. The Government states that imputed expenses are excluded from the "total expenses" calculation since, as with "total actual profit," those expenses are already reflected in the net expenses used in the CEP profit calculation. Gov't Brief at 40. Thus, according to the Government, excluding imputed expenses from both total actual profit and total expenses avoids double-counting of interest expenses. *Id.* Seeking to further bolster the agency's case on exclusion of imputed expenses from the total actual profit and total expenses calculations, the Government asserts that "normal accounting principles only permit the deduction of actual book expenses – not imputed expenses – for purposes of determining profit." Gov't Brief at 42.

The Government states that – although the Commerce Department excludes imputed expenses elsewhere in the CEP profit equation – it includes such expenses in the "total U.S. expenses" numerator  because it considers them to be selling expenses within the meaning of the statute.  Gov't Brief at 38.

Although the courts have had several occasions to address the Commerce Department's calculation of CEP profit, the precedent is – as the Government so delicately puts it – "mixed." Gov't Brief at 43.  The parties therefore point to different lines of cases in their efforts to support their positions.

Ta Chen relies on a line of authority in which courts have found that the plain language of the CEP statute makes clear that "total U.S. expenses" is a subset of "total expenses." *See*, *e.g.*, SNR Roulements v. United States, 24 CIT 1130, 1138, 118 F. Supp.2d 1333, 1340 (2000).[10]  Thus, those courts have reasoned, any expenses in the U.S. expenses numerator must logically also be included in the total expenses denominator. By that logic, that line of cases has consistently held that, when the Commerce Department includes imputed expenses in "total U.S. expenses," "[imputed expenses] must be included in 'total expenses' as well."  SNR Roulements at 1341.

Thai Pineapple took a rather different approach vis-à-vis the Commerce Department's exclusion of imputed expenses from "total actual profit" and "total expenses." The court there noted the agency's obligation to properly allocate profit to U.S. sales.  Focusing on the "total actual profit" side of the equation, the court found "some ambiguity" in the language of the CEP statute, such that

---

[10]*See also*, Fag Italia, S.p.A. v. United States, 24 CIT 1311, 1318, 2000 WL 1728317 at *6 (2000); Fag Kugelfischer Georg Schafer AG v. United States, 25 CIT ___, ___, 131 F. Supp. 2d 104, 114 (2001); NTN Bearing Corp. of America, 25 CIT ___, ___, 155 F. Supp. 2d 715, 743 (2001).

"it may not be an unreasonable interpretation to conclude that imputed expenses should be excluded in the actual profit calculation . . . ." Thai Pineapple Canning Indus. Corp. v. United States, 23 CIT 286, 296 (1999) ("Thai Pineapple I"), *aff'd in part, rev'd in part*, 273 F.3d 1077 (Fed. Cir. 2001).

However, Thai Pineapple I also emphasized that "nothing categorically prevents the inclusion of imputed expenses" in the CEP profit calculation. *Id.* The court explained that the exclusion of imputed expenses could be proper "*if* that construction can be squared with the necessity of a properly calculated statutory ratio." *Id.* (emphasis added). The court concluded that imputed expenses should be excluded "*if* they duplicate expenses already accounted for." *Id.* (emphasis added).[11]

The Government invokes Ausimont SPA v. United States, 25 CIT___, 2001 WL 1230596 (2001), which sustained the Commerce Department's CEP profit methodology. *See* Gov't Brief at 43-44. Similarly, Timken held the agency's exclusion of imputed expenses from the "total expenses" calculation to be "a reasonable interpretation of the statute." *See* Timken Co. v. United States, 26 CIT ___, ___, 240 F. Supp. 2d 1228, 1246 (2002).

_____

[11]Finding that the Commerce Department had not established that the imputed expenses were already accounted for in the "total expenses" denominator, Thai Pineapple I remanded the matter to the agency for further proceedings. 23 CIT at 296. In Thai Pineapple II, the court sustained the Commerce Department's CEP profit calculations. 24 CIT 107, 115 (2000). The court accepted the agency's "theory" that the particular data used to calculate the "total expenses" denominator reflected the interest expenses captured in the "total U.S. expenses" numerator. *Id.* The court then considered whether there was any reason why that theory would be inapplicable to the facts of that case. The court concluded that the petitioner had failed to demonstrate that the agency's exclusion of imputed expenses resulted in a distortion in the CEP profit calculations. The court also noted that the petitioner failed to counter the agency's argument that excluding imputed expenses avoided double counting. *Id.*

Timken thus broke with the holding in the SNR Roulements line of cases that mathematical logic and the plain language of the CEP profit statute require that "total U.S. expenses" be calculated as a subset of "total expenses."[12]  But Timken, like Ausimont, found U.S. Steel Group v. United States, 225 F.3d 1284 (Fed. Cir. 2000) ("U.S. Steel"), controlling.  The Court of Appeals there held that the "plain language and the structure" of the statute do not require symmetry between the definitions of "total U.S. expenses" and "total expenses." 225 F.3d at 1290.[13]

"Symmetry" is not truly in question here, however, because the Government maintains that the Commerce Department included the costs at issue in the "total expenses" denominator.  Nor is it clear that U.S. Steel controls.  As the Government concedes, U.S. Steel dealt with a different agency methodology that includes movement expenses in the "total expenses" denominator of the CEP profit ration, but excludes them from "total U.S. expenses."  *See* Gov't Brief at 43-44.  Thus, when the U.S. Steel court accepted the agency methodology there at issue, it approved the agency's *inclusion* of the certain expenses in the "total expenses" denominator.  255 F.3d at 1288.  Here, the agency has *excluded* the expenses at issue from the total expenses denominator – and they are, in any event, different from the expenses at issue in U.S. Steel.  Moreover, the Court of Appeals reasoned

---

[12]Thai Pineapple I, like the SNR Roulements line of cases,  also found that the CEP statute defines "total U.S. expenses" as a subset of "total expenses."  Thai Pineapple I at 296.

[13]The Government points to Ausimont SPA v. United States, 25 CIT ___ , 2001 WL 1230596 (2001), for the proposition that the reasoning of U.S. Steel undercuts Ta Chen's claim that the agency's CEP profit methodology is contrary to law.  Gov't Brief at 42-43.  In Ausimont, the court indeed stated that U.S. Steel "appears" to undercut the respondent's arguments regarding symmetry. 25 CIT at ___ , 2001 WL 1230596, at *21.  Nevertheless, the Ausimont court was careful to note that *the record* there did not support a finding that the agency's methodology caused a distortion in the CEP profit calculation.  *Id.*

in U.S. Steel that the statute equates "total expenses" with "all expenses," and thus "does not exclude

movement expenses, but rather suggests their inclusion with the breadth of [the] definition of 'total

expenses.'" *Id.* at 1290. Thus, to the extent that U.S. Steel is relevant here, its broad reading of "total

expenses" would appear to favor Ta Chen.

In any event, even if the Commerce Department's exclusion of imputed expenses from the

"total actual profit" and "total expenses" calculations is based on a reasonable interpretation of the

statute, "it is possible for the application of that methodology to be unreasonable in a given case

when a more accurate methodology is available and has been used in similar cases." Thai Pineapple

Canning Ind. Corp. v. United States, 273 F.3d 1077, 1085 (Fed. Cir. 2001) (finding that the agency's

standard methodology for matching costs to sales made during the period of review unreasonably

caused distortions in the calculation of respondent's dumping margin).

Here, as Ta Chen argued before the agency, the Commerce Department's methodology finds

TCI's U.S. sales to be "staggeringly profitable – in sharp contrast to reports . . . that U.S. market

prices for fittings were at unprofitable levels." Decision Memo at 17. Ta Chen explains that TCI's

sales of subject fittings had exceptionally long average inventory time, resulting in inventory carrying

costs greatly exceeding the actual interest costs allocated by the agency. Ta Chen Brief at 25.

Further, Ta Chen maintains, and the Government fails to dispute, that the Commerce

Department has previously included imputed expenses in CEP profit calculations of TCI's U.S.

sales, while avoiding double counting. *Compare* Ta Chen Brief at 27-29 (*citing* Final Determination

of Sales at Less Than Fair Value: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 58

Fed. Reg. 28,556, 28,558 (May 14, 1993)), *with* Gov't Brief at 45. Indeed, it does appear that the

agency previously avoided double counting by calculating an offset to TCI's actual interest costs to account for the portion reflecting imputed credit and inventory carrying costs. *Id.* at 28.

Moreover, the Commerce Department here actually "ran a test program which added imputed credit and inventory carrying costs to the total expenses used in the calculation of the total profit ratio." Decision Memo at 29 n.9. Although the agency asserted that the resulting change in the CEP profit ratio was "insignificant," the very fact of that test program casts doubt on the Government's claim that accepted accounting principles prohibit the inclusion of imputed expenses in determining profit (and/or any claim that the agency adheres religiously to those principles in all cases). In any event, as Ta Chen observes, the agency failed to include any documentation of its test program in the administrative record filed here, effectively precluding independent analysis and judicial review. Ta Chen Brief at 32 n.16.

The evidence of record suggests that the agency's CEP profit methodology in this case in fact may have distorted the allocation of profit to TCI's U.S. sales, as Ta Chen claims. Thus, the case must be remanded to afford the agency an opportunity to explain why, in this case, actual expenses are an adequate proxy for imputed expenses, or – if necessary – to recalculate Ta Chen's CEP profit to properly reflect TCI's imputed expenses. Further, it is not clear from the record whether, in other cases, the Commerce Department has indeed used other methodologies for calculating CEP profit that avoid double counting while more accurately accounting for imputed expenses. On remand, the agency will have an opportunity to explain whether and, if so, in what circumstances, it includes imputed expenses in the total expenses denominator of the statutory CEP profit ratio, and in the calculation of total actual profit.

C.  The Calculation of TCI's Indirect Selling Expenses

In calculating Ta Chen's constructed export price, the Commerce Department was required to make deductions to account for indirect selling expenses incurred in the U.S. by Ta Chen's subsidiary, TCI. *See* 19 U.S.C. § 1677a(d)(1)(D).  Indirect selling expenses are expenses – such as salespersons' salaries – that are incurred regardless of whether particular sales have been made, but are reasonably attributable to such sales.  SAA at 824; AD Manual, Chap. 8 at 44.

In this case, the Commerce Department based its calculation of indirect selling expenses on figures in TCI's income statement for fiscal year 1998.  Decision Memo at 22.  The Domestic Producers contend that the figures in the statement for fiscal year 1999 should have been used instead.  *See generally* Dom. Prod. Brief at 9-21; Dom. Prod. Reply Brief at 4-12. The Domestic Producers assert that the 1998 data are inherently less accurate, given the period of review at issue (June 1, 1998 through May 31, 1999),  because – while the 1998 data overlap with *five* months of the period of review  – the 1999 data cover the period from November 1, 1998 to October 31, 1999, and thus overlap with *seven* months of the period of review.  Dom. Prod. Brief at 15-16; Dom. Prod. Reply Brief at 2 n.2.

The antidumping statute does not specify how indirect selling expenses are to be calculated. Koenig & Bauer-Albert AG v. United States, 22 CIT 574, 580, 15 F. Supp.2d 834, 843 (1998), *rev'd on other grounds*, 259 F.3d 1341 (Fed. Cir. 2001).  The Commerce Department's usual practice is to use the audited fiscal year financial statements that most closely correspond to the period of review.  Gov't Brief at 57 (*citing* Final Results of Antidumping Duty Administrative Review: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From

Japan, 66 Fed. Reg. 11,555 (Feb. 26, 2001) (Issues and Decision Memorandum at comment 3, 2001

WL 193868)).  However, that practice is not carved in stone, and the agency deviates from it, where

appropriate.[14]

In this instance, as discussed in section I.B above, the Commerce Department justified its

reliance on TCI's 1998 income statement (rather than the data for fiscal year 1999) by explaining its

preference for the use of "*actual*, verified data for . . . final results." Decision Memo at 29 (emphasis

added). [15]  *See generally* Gov't Brief at 55-61.  As the Department pointed out, the 1999 data include

*estimates* for certain legal fees and other expenses.  Decision Memo at 29.  And, as the agency

further observed, the use of 1998 data to calculate U.S. indirect selling expenses had the added virtue

of being consistent with the agency's use of 1998 data in calculating indirect expenses in Ta Chen's

---

[14]*See*, *e.g.*, Final Results of Antidumping Duty Administrative Reviews: Certain Corrosion Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada, 62 Fed. Reg. 18,448, 18,456 (Feb. 11, 1998) (indirect selling expenses calculated based on *monthly* financial statements from the period of review); *see generally* Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Japan, 64 Fed. Reg. 24,329, 24,354 (May 6, 1999) (explaining that the Commerce Department alters its methodology for allocating certain indirect expenses where "case specific facts . . . clearly support a departure from [the agency's] normal practice . . . ").

[15]As further justification for its reliance on TCI's 1998 income statement (rather than that for 1999), the Commerce Department explains that the 1998 data were subjected to verification. Decision Memo at 29.  As the Domestic Producers observe, however, the verification process is essentially a "spot-check," so that not all data that was eventually used was actually reviewed during verification.  Dom. Prod. Brief at 16-17.  Moreover, the 1999 data were within the scope of the agency's verification outline here.  Dom. Prod. Brief at 17-18.  The Domestic Producers therefore contend that the fact that the 1998 data were verified should not elevate them above the 1999 data. Dom. Prod. Brief at 16.  It does appear that the Commerce Department may somewhat overstate the significance of the verification.  But that does not change the result here.  The agency's decision to use the 1998 data rather than the 1999 data would be reasonable, even if those data had not been verified.

home market.  <u>Decision Memo</u> at 29.  Finally, as the agency noted, Ta Chen expressed concern that the 1999 data reflect certain extraordinary expenses incurred in the five months after the period of review, which could have distorted the Commerce Department's calculations.  <u>Decision Memo</u> at 29.[16]

The Domestic Producers advance no reason, beyond the two-month difference in overlap, for favoring the 1999 income statement over the earlier statement on which the agency relied.  And that difference in overlap is essentially *de minimis* – that is, two twelfths, or one sixth, to be precise.  Moreover, the uncontroverted statements of Ta Chen concerning extraordinary expenses incurred in 1999, but outside the period of review, further support the conclusion that the 1998 data more accurately reflect the indirect expenses that TCI actually incurred during the period of review.

Under the circumstances, the Commerce Department's reliance on the 1998 income statement based entirely on actual data, rather than the 1999 statement incorporating estimates, was reasonable; and the agency's articulated rationale for deviating from its typical practice passes muster.  Accordingly, the Commerce Department's calculation of TCI's indirect selling expenses must be sustained, and the Domestic Producers' objections must be rejected.

---

[16]Ta Chen's brief in support of its Motion for Judgment on the Agency Record did not anticipate the Domestic Producers' challenge to the calculation of TCI's selling expenses.  And Ta Chen elected not to file a reply brief in this action.  However, the company addressed the issue at the administrative level, defending the Commerce Department's use of data from the income statements for fiscal year 1998, and expressing concern that the 1999 data reflect certain extraordinary expenses incurred after the period of review.  *See* Pub. Doc. 88 at 4.

D.  The Denial of a CEP Offset Adjustment

Ta Chen's final attack on the Commerce Department's determination targets the agency's decision to deny the company a "CEP offset" adjustment to "normal value" to reflect asserted "level of trade" differences between the home (Taiwan) market and the market in the U.S.  *See generally* Ta Chen Brief at 4, 33-39.  As explained in section I.A above, a CEP offset adjustment is appropriate where "normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price" (thus justifying a "level of trade" adjustment), but where the data available are not sufficient to determine a level of trade adjustment. 19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f).

Ta Chen asserts that a CEP offset adjustment was warranted in this case because, *inter alia*, "[the Commerce Department] itself verified two selling activities/functions – inventory and selling effort – as (a) only occurring for [Ta Chen's] home market fitting sales and not its U.S. CEP sales to its affiliate TCI and (b) involving costs of about 5% of price on home market sales."  Ta Chen Brief at 37.

Whatever may have been the merits of Ta Chen's claim to a CEP offset adjustment, that claim was doomed by the company's failure to raise the issue before the Commerce Department in a timely fashion.  In short, it is undisputed that the Commerce Department's Preliminary Results included a specific finding that Ta Chen was not entitled to such an offset.  *See* Preliminary Results, 65 Fed. Reg. at 41,632 (Commerce Department findings that Ta Chen not entitled to CEP offset because "any differences in selling activities [between the Taiwan and U.S. markets] are not significant" and "the LOT [level of trade] in the home market matched the LOT of the CEP

transactions"). *See also* Gov't Brief at 48; Ta Chen Brief at 36; Dom. Prod. Response Brief at 9, 11.

It is also undisputed that Ta Chen failed to challenge that finding in the case brief that it filed with

the Commerce Department following the issuance of the Preliminary Results, and that the company

raised the issue for the first time only in its November 20, 2000 response to the agency's request for

comments on the reimbursement issue. Gov't Brief at 48; Ta Chen Brief at 39 n.23; Dom. Prod.

Response Brief at 9, 11. Ta Chen thus failed to properly exhaust its administrative remedies.[17]

As a general matter, the doctrine of exhaustion holds that "no one is entitled to judicial relief

for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (*quoting* McKart v. United

States, 395 U.S. 185, 193 (1969)) (internal quotations omitted). The prescribed remedy for

challenging Preliminary Results issued by the Commerce Department is to file a case brief with the

agency setting forth objections. By regulation, the Department affords interested parties the

opportunity to submit such briefs within 30 days after Preliminary Results are published. The

regulations specifically require that such briefs "present *all* arguments . . . relevant to the Secretary's

. . . final results, including any arguments presented before the date of publication of the . . .

preliminary results." 19 C.F.R. § 351.309(c)(1)-(2) (emphasis added).

This Court has "generally take[n] a strict view of the need [for parties] to exhaust [their]

remedies by raising all arguments" in a timely fashion so that they may be appropriately addressed

---

[17]Ta Chen's brief in support of its Motion for Judgment on the Agency Record did not anticipate the exhaustion arguments advanced by the Government and by the Domestic Producers. Moreover, as indicated in note 16 above, Ta Chen elected not to file a reply brief. Accordingly, the Court has not had the benefit of Ta Chen's views on the doctrine of exhaustion and its application here.

by the agency. <u>Pohang Iron and Steel Co. v. United States</u>, 23 CIT 778, 792 (1999). The underlying principle is that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." <u>United States v. L.A. Tucker Truck Lines, Inc.</u>, 344 U.S. 33, 37 (1952). The doctrine of exhaustion thus works to serve two basic purposes: It allows the administrative agency to perform the functions within its area of special competence (to develop the factual record and to apply its expertise), and – at the same time – it promotes judicial efficiency and conserves judicial resources, by affording the agency the opportunity to rectify its own mistakes (and thus to moot controversy and obviate the need for judicial intervention). *See* <u>Parisi v. Davidson</u>, 405 U.S. 34, 37 (1972); <u>Richey v. United States</u>, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (exhaustion serves "the twin purposes . . . of protecting administrative agency authority and promoting judicial efficiency") (citation omitted).

In this case, the policy considerations underlying the doctrine of exhaustion cut against Ta Chen. Because Ta Chen failed to raise the CEP offset issue in its Case Brief filed following the issuance of the Preliminary Results, the petitioners did not address the issue in their rebuttal brief and the Commerce Department was not put on timely notice of the company's objection. *See* Non-Pub. Doc. 47. And, while it might have been at least theoretically possible for the Department to consider the issue later (*e.g.*, when it addressed the reimbursement issue), the agency was under no obligation to do so. Permitting even one party to "flout[   ] . . . administrative processes could weaken the effectiveness of an agency by encouraging [others] to ignore its procedures." <u>McKart v. United States</u>, 395 U.S. at 195. In this context, the consequences of flouting agency processes

could be potentially devastating, given the extraordinarily tight time constraints prescribed by Congress in the statutes governing international trade.

Congress has expressly mandated that this Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). In an antidumping case such as this, where "Congress has prescribed a clear, step-by-step process for a claimant to follow, . . . the failure to do so precludes [the claimant] from obtaining review of that issue in the Court of International Trade." JCM, Ltd. v. United States, 210 F.3d 1357, 1359 (Fed. Cir. 2000) (*citing* Sandvik Steel Co., 164 F.3d at 599-600).[18]

In sum, because Ta Chen failed to timely raise before the Commerce Department its claim that it was entitled to a CEP offset adjustment, it cannot now be heard to criticize the agency for denying it that offset. By its silence, Ta Chen waived its right to raise the issue on appeal. *See* AIMCOR v. United States, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998).

---

[18]None of the established exceptions to the doctrine of exhaustion is relevant here. *See generally* Luoyang Bearing Factory v. United States, 26 CIT ___, ___ n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002). For example, Ta Chen had timely access to the confidential administrative record. *Compare* Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F. Supp. 1317, 1321 (1986). And Ta Chen does not charge that the agency failed to adhere to some clearly applicable precedent. *Compare* 10 CIT at 79-80, 630 F. Supp. at 1320-21. There is no indication that it would have been futile for the company to have timely raised its CEP offset argument before the agency. *Compare* PPG Indus., Inc. v. United States, 14 CIT 522, 542-43, 746 F. Supp. 119, 137 (1990). No judicial interpretation has intervened. *Compare* Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986). And the CEP offset issue is not a pure question of law. *Compare* Hercules, Inc. v. United States, 11 CIT 710, 735, 673 F. Supp. 454, 476 (1987). *See generally* Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991) (surveying cases where exhaustion has not been required); Layton & Fine, *The Draft and Exhaustion of Administrative Remedies*, 56 Geo. L.J. 315, 322-31(1967) (discussing exceptions to requirement of exhaustion) (*cited in* McKart v. United States, 395 U.S. at 193 n.9).

### III. **Conclusion**

For the reasons set forth above, the Domestic Producers' Motion for Judgment on the Agency Record is denied in its entirety, and Ta Chen's motion is granted in part. This action is remanded to the Department of Commerce to permit it to reconsider the factual and legal bases for its determination concerning the alleged reimbursement agreement; to allow it to reconsider its calculation of CEP profit; and to accord it the opportunity to fully articulate the reasoning underlying its findings, conclusions and determinations on those issues.

A separate order will enter accordingly.

/s/          Delissa A. Ridgway          
Judge

Decided:   May 4, 2004  
           New York, New York