**Slip Op. 06-47**

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————

TA CHEN STAINLESS STEEL PIPE, LTD.,

        *Plaintiff*,

        v.

UNITED STATES,

        *Defendant*,

        and

ALLOY PIPING PRODUCTS, INC., ET AL.,

        *Defendant-Intervenors*.

—————————————————————

ALLOY PIPING PRODUCTS, INC.,
FLOWLINE DIVISION, MARKOVITZ
ENTERPRISES, INC., GERLIN, INC. and
TAYLOR FORGE STAINLESS, INC.,

        *Plaintiffs*,

        v.

UNITED STATES,

        *Defendant*.

—————————————————————

Consolidated
Court No. 01-00027

[U.S. Department of Commerce's Final Results Pursuant to Remand are sustained.]

Decided: April 6, 2006

Miller & Chevalier Chartered (Peter J. Koenig), for Plaintiff Ta Chen Stainless Steel Pipe, Ltd.

Collier Shannon Scott, PLLC (David A. Hartquist and Jeffrey S. Beckington), for Plaintiffs/Defendant-Intervenors Alloy Piping Products, Inc., *et al.*

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Rachael E. Wenthold, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant United States.

**OPINION**

RIDGWAY, Judge:

At issue in this action are the final results of the U.S. Department of Commerce's sixth administrative review of the antidumping duty order covering certain stainless steel butt-weld pipe fittings from Taiwan. *See* Final Results of Antidumping Administrative Review: Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan, 65 Fed. Reg. 81,827 (Dec. 27, 2000) ("Final Results"). The Final Results were challenged by Ta Chen,[1] as well as the Domestic Producers,[2] in two separate appeals which were consolidated into this action.

In brief, Ta Chen I addressed a total of four issues disputing the Final Results, remanding two of those issues to Commerce. *See generally* Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28

---

[1]Ta Chen is a Taiwanese producer and exporter of stainless steel butt-weld pipe fittings subject to the underlying antidumping duty order. Ta Chen sells its pipe fittings to its U.S. subsidiary, Ta Chen International ("TCI"), which – in turn – sells them to unaffiliated U.S. customers. *See generally* Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT ____, ____, 342 F. Supp. 2d 1191, 1195 (2004) ("Ta Chen I").

[2]The Domestic Producers – Alloy Piping Products, Inc.; Flowline Division, Markovitz Enterprises, Inc.; Gerlin, Inc.; and Taylor Forge Stainless, Inc. – were the domestic petitioners in the underlying administrative review.

CIT ____, 342 F. Supp. 2d 1191 (2004) ("Ta Chen I").[3]  Specifically, Ta Chen I instructed

Commerce to reconsider its determination to double Ta Chen's dumping margin based on an

agreement dating from 1992 to 1994 under which the agency found that Ta Chen had agreed to

reimburse antidumping duties paid by TCI.  *See* Ta Chen I, 28 CIT at _____, 342 F. Supp. 2d at

1197-99.  In addition, Commerce was directed to justify its practice of using recognized expenses

in some parts of its standard equation for calculating Constructed Export Price ("CEP") Profit, in

light of its use of imputed expenses elsewhere in that equation.  *See* Ta Chen I, 28 CIT at _____, 342

F. Supp. 2d at 1199-1203.[4]

Now pending before the Court are Commerce's Final Results Pursuant to Remand ("Remand

Results"), together with the parties' comments thereon.  *See* Plaintiff Ta Chen Stainless Steel Pipe,

Ltd.: Opposition to August 16, 2004 Final Results Pursuant to Remand of the U.S. Department of

Commerce ("Ta Chen Remand Brief"); Defendant-Intervenors' Comments Regarding the U.S.

Department of Commerce's Final Results Pursuant to Remand ("Dom. Prods. Remand Brief");

Defendant's Response to the Parties' Comments Concerning the Remand Results ("Gov't Remand

Brief").

---

[3]Familiarity with Ta Chen I is presumed.

[4]In contrast, Ta Chen I rejected the Domestic Producers' attack on Commerce's calculation of TCI's indirect selling expenses, as well as Ta Chen's challenge to the agency's decision denying the company a CEP Offset Adjustment.  *See generally* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1203-07.

As a result of its reconsideration on remand, Commerce has recalculated the antidumping margin for Ta Chen. As revised, Ta Chen's weighted-average margin for the period of review is 6.42%. *See* Remand Results at 29, 31.

As discussed more fully below, the Remand Results that Commerce has filed with the Court comply with Ta Chen I. They are, therefore, sustained.

## I. The Remand Results on the Alleged Reimbursement Agreement

As Ta Chen I explained, Ta Chen's threshold attack on the results of the administrative review challenged Commerce's determination to double Ta Chen's dumping margin based on the agency's finding that company financial statements evidenced an agreement by Ta Chen to reimburse TCI (its U.S. subsidiary) for antidumping duties imposed on Ta Chen's merchandise. The agency concluded that "evidence pointing to a reimbursement agreement dating from 1992 to 1994 raised 'a rebuttable presumption that the agreement [was] still in effect during [this period of review].'" Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1196-97 (*quoting* final results of administrative review).

Ta Chen argued that the mere existence of an agreement to reimburse duties incurred from 1992 through 1994 cannot constitute evidence that reimbursement occurred during the period of review here at issue. In addition, Ta Chen asserted that Commerce abused its discretion by refusing to consider evidence proffered by the company to prove that there was no reimbursement agreement and that no reimbursement had occurred during the relevant period. Finally, Ta Chen challenged the validity of Commerce's "reimbursement regulation" – the regulation that the agency invoked in doubling Ta Chen's duty rate. According to Ta Chen, because that regulation authorizes the imposition of antidumping duties in excess of the calculated dumping margin, the regulation

contravenes both the U.S. antidumping statute and the United States' international obligations. *See* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1197-98.

The Government vigorously defended the legality of Commerce's regulation. But even the Government had to concede that Commerce's rejection of the information that Ta Chen sought to submit to the agency in the course of the administrative review had "denied [Ta Chen] a meaningful opportunity to rebut [the Commerce Department's] presumption of reimbursement." Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1198 (*quoting* Government's opening brief).

Accordingly, with the support of the Government as well as the Domestic Producers, Ta Chen I remanded the reimbursement issue to Commerce, with instructions to "reconsider the bases for its determination concerning the alleged reimbursement agreement, in light of any relevant factual evidence, as well as the agency's own findings, conclusions, and determinations in other matters . . . , and the applicable law." Ta Chen I, 28 CIT at ____, ____, 342 F. Supp. 2d at 1198-99, 1207.

On remand, Commerce requested and reviewed additional information from Ta Chen. Based on that information, the agency found that the reimbursement agreement "expressly mentions only the 1992-1994 period." Remand Results at 28. Concluding that "an agreement to reimburse antidumping duties . . . was not in effect" for any subsequent period (including the period of review here at issue), Commerce has rescinded its decision to double Ta Chen's antidumping margin (reducing the margin to 6.42%). *Id*. at 28-29, 31.

Because the Remand Results on the issue of the reimbursement agreement comply in full with the Court's instructions in Ta Chen I, and absent any objection by the parties,[5] those Remand Results are sustained.

## II.  The Remand Results on Calculation of CEP Profit

As Ta Chen I sets forth in greater detail,[6] dumping occurs when goods are imported into the U.S. and sold at a price lower than their "normal value."  19 U.S.C. §§ 1673, 1677(34).[7]  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the "dumping margin" – the difference between the normal value and the U.S. price – may be imposed.  19 U.S.C. §§ 1673(2)(B), 1677(35)(A).

Normal value is calculated using the exporting (home) market price (*i.e.*, the price in the market where the goods are produced), an appropriate third country market price, or the cost of production of the goods.  19 U.S.C. § 1677b.  Where – as in this case – the U.S. purchaser is affiliated with the producer or exporter, the U.S. price is  based on the first sale from the affiliated purchaser (here, Ta Chen's subsidiary, TCI) to an unaffiliated purchaser in the U.S.  This is the basis for constructed export price ("CEP").  19 U.S.C. § 1677a(b).

_____

[5]*See* Gov't Remand Brief at 2 (noting that no party objected to the Remand Results on the issue of the reimbursement agreement, and asserting that "thus, the Remand Determination should be sustained upon that issue"); Dom. Prods. Remand Brief at 1 n.1 (advising that the Domestic Producers' comments  on the Remand Results "do not address the . . . question of reimbursement of antidumping duties").  Ta Chen's brief is entirely silent on the issue.

[6]*See generally* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1193-95.

[7]All statutory citations are to the 1994 version of the U.S. Code.  The pertinent text of the cited provisions remained the same at all times relevant herein.

Because the prices used to determine normal value and the U.S. price occur at different points in the stream of commerce, and under different circumstances, certain adjustments are made to attempt to make them comparable, to ensure "apples to apples" price comparisons. Where – as here – the price to be calculated is CEP, additional special adjustments are made. Among these are adjustments to account for selling expenses incurred in the U.S. by the entity affiliated with the foreign producer or exporter (including expenses such as commissions, guarantees and warranties, and credit expenses). 19 U.S.C. § 1677a(d)(1).

In addition to the adjustments for selling expenses, the CEP is reduced to account for the portion of profit attributable to those selling expenses. 19 U.S.C. § 1677a(d)(3). It is the calculation of this CEP Profit adjustment that is the focus of Ta Chen's remaining claim. Specifically, Ta Chen maintains that the "enormous . . . inventory carrying and credit costs" in this case are not properly accounted for by Commerce's application of its standard methodology for calculating CEP Profit, which treats such costs as "embedded" in a respondent's actual, *recognized expenses* in certain parts of the CEP Profit equation, while accounting for the same costs with *imputed expenses* elsewhere in the equation. *See* Ta Chen Remand Brief at 13; SNR Roulements v. United States, 402 F.3d 1358, 1361, 1363 (Fed. Cir. 2005) (explaining assumptions underlying Commerce's standard methodology).

As outlined in Commerce's CEP Profit Policy Bulletin,[8] CEP Profit is determined by allocating a portion of the "Total Actual Profit" for *all* production and selling activities of the subject merchandise to *U.S.* CEP selling and further-manufacturing activities. The calculation of CEP Profit can be expressed in an equation:

$$\text{Total CEP Profit allocated to U.S. expenses} = \text{Total Actual Profit} \times \frac{\text{Total U.S. Expenses}}{\text{Total Expenses}}$$

For purposes of the CEP Profit equation, Commerce calculates the "Total Actual Profit" multiplier by (1) adding the revenue attributable to sales of subject (or like) merchandise in both the U.S. and the home market; (2) deducting from that sum the cost of the merchandise for both markets; and (3) deducting the selling, packing, and distribution expenses for both markets. *See* Remand Results at 4 (*citing* 19 U.S.C. § 1677a(f)(2)(D); CEP Profit Policy Bulletin). The "Total Expenses" denominator is calculated by adding (1) the cost of merchandise for both markets and (2) the selling, packing, and distribution expenses for both markets. *See* Remand Results at 4 (*citing* 19 U.S.C. § 1677a(f)(2)(C); CEP Profit Policy Bulletin). Under Commerce's standard methodology for calculating CEP Profit, in both the "Total Expenses" denominator and the "Total Actual Profit" multiplier, *recognized financial expenses* are included in the cost of both the U.S. and the home market merchandise. *See* Remand Results at 4 & n.1 (*citing* CEP Profit Policy Bulletin); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 825 (1994),

---

[8]*See* U.S. Department of Commerce Policy Bulletin 97/1, Calculation of Profit for Constructed Export Price Transactions (Sept. 4, 1997) ("CEP Profit Policy Bulletin"); *see also* The Timken Co. v. United States, 26 CIT 1072, 1087, 240 F. Supp. 2d 1228, 1244 (2002), *aff'd on other grounds*, 354 F.3d 1334 (Fed. Cir. 2004) (Commerce's official CEP Profit Policy Bulletin is "well-established" and "consistently applied" by the agency).

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4164 (stating that "[t]he total profit is calculated on the same basis as the total expenses").

As Commerce explains its standard methodology, "[w]hen calculating both the 'Total Actual Profit' multiplier and the 'Total Expenses' denominator, net financial expenses are calculated from the [foreign producer/exporter's] constructed value ('CV') database in determining the cost of U.S. merchandise, and from the [foreign producer/exporter's] cost of production ('COP') database in determining the cost of home market merchandise." Remand Results at 5 (*citing* 19 U.S.C. §§ 1677b(e), 1677b(b)(3)). Commerce notes that "[g]enerally, net financial expenses are calculated by offsetting the total financial expenses incurred with any financial income earned during the period." Remand Results at 5. Because net financial expenses are included in both the "Total Actual Profit" multiplier and the "Total Expenses" denominator as a cost item, and because Commerce historically has read the statute to require that those two numbers be actual (*i.e.*, *recognized*) amounts,[9] the agency's standard methodology does not include *imputed* financial expenses as an expense item in the CEP Profit calculation. *See* Remand Results at 5-6 (*citing* CEP Profit Policy Bulletin at n.5).

In contrast to the *recognized* figures used in other parts of the CEP Profit equation, "Total U.S. Expenses" – the numerator of the ratio in that equation – includes *imputed* credit and inventory carrying costs, as an approximation of the borrowing costs associated with U.S. selling activities. *See* Remand Results at 5.[10] As Commerce observes, "[t]he imputed financial expenses related to

---

[9]*See generally* n.14, *infra*.

[10]Commerce notes that "inclusion of the imputed financial expenses in the 'Total U.S. Expenses' numerator is consistent with 19 U.S.C. § 1677a(f)(2)(B), which defines the term 'Total

selling activities [*i.e.*, imputed credit and inventory carrying costs] simply represent the opportunity cost of having . . . merchandise sit in inventory prior to sale, and of extending credit after the sale. To the extent that a company incurs a longer waiting period between production and payment, it will not have recourse to such funds and will generally incur greater financial expenses" than it would if the company received payment immediately upon production. Remand Results at 6-7.

As the Remand Results explain, *imputed* expenses are used in the "Total U.S. Expenses" numerator largely because, as a practical matter, appropriate *recognized* figures do not exist. In other words, because money is fungible, "it is difficult to ascertain exactly which portion of [a producer/exporter's] financial expenses arises as a result of certain specific operations of the company, such as U.S. selling activities." The imputed expenses are an *estimate* of that amount. *See* Remand Results at 5-6, 17, 22.

Finally, as the Remand Results note – because a company's total recognized financial expenses reflect its costs of carrying merchandise in inventory and extending credit, and because those recognized expenses are included in the "Total Expenses" denominator and in the "Total Actual Profit" multiplier – the corresponding imputed expenses must be excluded from those parts of the CEP Profit equation, to avoid double-counting. By the same token, because the "Total U.S. Expenses" numerator includes imputed expenses, the corresponding recognized expenses must be excluded from that part of the equation. *See* Remand Results at 5-7, 15-16.

---

U.S. Expenses' as described under 19 U.S.C. § 1677a(d)(1) and (2)." Remand Results at 5; *see also* Gov't Remand Brief at 4.

A.  The General Sufficiency of the Remand Results

From the inception of this case, Ta Chen has asserted that the Commerce Department's application here of its standard methodology for calculating CEP Profit essentially "ignore[d] enormous . . . inventory carrying and credit costs," making U.S. sales of Ta Chen's merchandise appear overly profitable in comparison to home market sales.  *See* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1199-1200 (*quoting* Ta Chen's opening brief); Ta Chen Remand Brief at 3-4, 8, 10, 13-16.

Based on the arguments raised by Ta Chen, as well as the then-existing conflicts in the relevant case law, Ta Chen I instructed the Commerce Department to explain in greater detail why the *recognized* expenses included in the "Total Expenses" denominator and in the "Total Actual Profit" multiplier are an adequate proxy for the *imputed* expenses included in the "Total U.S. Expenses" numerator.  *See generally* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1199-1203.

Ta Chen now claims that Commerce's Remand Results do little more than parrot the agency's previous arguments and analyses, and thus fail to comply with the remand instructions in Ta Chen I.  *See*, *e.g.*, Ta Chen Remand Brief at 2-6, 15-16.  There is, however, no truth to that charge.  The Remand Results amply evidence Commerce's compliance with the Court's mandate. *See* Remand Results at 1-4, 13-14 & *passim*; *see generally* Gov't Remand Brief at 2-3; Dom. Prods. Remand Brief at 1.

Specifically, as summarized above, the Remand Results elaborate on the statutory basis for Commerce's standard methodology, and describe in greater detail the methodology in general. *See generally* Remand Results at 4-8, 14; Gov't Remand Brief at 4.  In particular, the Remand Results

explain how the imputed financial expenses included in the "Total U.S. Expenses" numerator are a reasonable surrogate for the relevant recognized financial expenses included in both the "Total Expenses" denominator and the "Total Actual Profit" multiplier. *See generally* Remand Results at 1-2, 4-10, 14, 16; Gov't Remand Brief at 4-5.[11]  The Remand Results further demonstrate that, in principle, the application of Commerce's standard methodology properly accounts for a producer/exporter's financial expenses in all parts of the CEP Profit equation. *See generally* Remand Results at 3-8, 14; Gov't Remand Brief at 3-4.

Moreover, as discussed more fully in section II.D below, the supplemental administrative record filed with the Remand Results includes the test program that Commerce ran in this case. As the Remand Results explain, that test program demonstrates that – even if the imputed expenses had been included in the "Total Actual Profit" multiplier and the "Total Expenses" denominator in this case – such a change would have had only a minimal effect on Ta Chen's dumping margin. *See* Remand Results at 10-11, 21.  Indeed, the Remand Results indicate that – contrary to Ta Chen's assertions – the addition of *imputed* expenses to those parts of the CEP Profit equation that already include corresponding *recognized* financial expenses would not render a more accurate dumping

---

[11]The reasoning advanced by Commerce here has been sustained in other cases, some of which have expressly recognized that, although the imputed figures and recognized figures may not be exactly the same, they are reasonable surrogates for one another. *See*, *e.g.*, SNR Roulements, 402 F.3d at 1361-63; SNR Roulements v. United States, 28 CIT ____, ____, 341 F. Supp. 2d 1334, 1340 (2004) (citation omitted), *appeal docketed*, Nos. 05-1297, 05-1322 & 05-1323 (Fed. Cir. April 11, 2005); The Timken Co., 26 CIT at 1090, 240 F. Supp. 2d at 1247; Thai Pineapple Canning Indus. Corp. v. United States, 24 CIT 107, 115 (2000), *aff'd in part*, *and rev'd in part on other grounds*, 273 F.3d 1077 (Fed. Cir. 2001). *See also* Remand Results at 16.

margin but, rather, would itself result in distortion (due to double-counting). *See* Remand Results at 11-12; *see also id*. at 5-7, 15-16.

For its part, Ta Chen has failed to adduce any real evidence to substantiate its claims that Commerce's standard methodology for calculating CEP Profit improperly distorted the results in this case.[12] *See* SNR Roulements, 402 F.3d at 1361 (Commerce's standard methodology for calculation of CEP Profit to be sustained absent challenging party's "showing that the amount of imputed expenses is not accurately reflected or embedded in its actual expenses"); *see also* SNR Roulements, 28 CIT at ____, 341 F. Supp. 2d at 1340 (Commerce's standard methodology to be sustained absent demonstration that (1) including imputed expenses in denominator and multiplier parts of calculation would not result in double-counting, or (2) that standard methodology results in distortion); Thai Pineapple, 24 CIT at 114-15 (sustaining Commerce's standard methodology because plaintiff failed to demonstrate any significant discrepancy).

Ta Chen's brief contesting the Remand Results is not a model of clarity, to say the least. However, distilled to its essence, it appears to press two principal challenges to the application of Commerce's standard methodology in this case. As discussed below, neither of those arguments is well-founded; and Ta Chen's other points are equally unavailing.

### B. The Magnitude of the Numerator vs. the Denominator

Ta Chen first seeks to make much of the fact that the imputed credit and inventory carrying expenses reflected in the numerator of Commerce's CEP Profit equation exceed the recognized

---

[12]*See generally* Ta Chen Remand Brief at 2, 4-6, 13-16; *but see* Gov't Remand Brief at 5-6.

financial expenses included in the denominator. *See* Ta Chen Remand Brief at 6, 8, 11. Indeed, Ta Chen characterizes this point as the "basic distortion at issue" here. *See* Ta Chen Remand Brief at 6.

Ta Chen simply misunderstands the CEP Profit equation. *See generally* Gov't Remand Brief at 6-7. Contrary to Ta Chen's implication, "there is no theoretical or logical requirement that the imputed U.S. inventory carrying cost[s] and imputed U.S. credit expense[s] [reflected in the numerator of Commerce's equation] should somehow be *limited to or less than* the total amount of recognized net financial expenses . . . included in the 'Total Expenses' denominator." Remand Results at 10. The operative word in that sentence is "net." As the Remand Results explain, "the imputed expenses in the numerator are *gross* expenses, while the recognized financial expenses in the denominator are *net* of interest income, which itself may not be allocable to U.S. selling activities. Thus, the imputed expenses may reasonably exceed the amount of recognized financial expenses in the denominator without the existence of a distortion." Remand Results at 13.[13]

_____

[13]*See also* Remand Results at 16 ("The imputed expenses are an estimate of the amount of gross financial costs associated with the respondent's U.S. selling activities. The recognized financial expenses are net amounts of financial expenses associated with all production and selling activities, both in the United States and the home market."), 22 ("The imputed expenses are an estimate of the amount of financial costs associated with the respondent's U.S. selling activities. The recognized expenses are net financial costs associated with all production and selling activities, both in the United States and the home market."), 23 (addressing claim that "Ta Chen had large imputed financial expenses for U.S. selling activities, yet . . . TCI had very little recognized interest expense during the [Period of Review]" at issue).

The gravamen of Ta Chen's case – and the apparent basis for its preference for the use of imputed figures – seems to be that it has "enormous . . . inventory carrying and credit costs" which, it contends, are not adequately reflected (i.e., are understated) in the recognized figures used in both the "Total Expenses" denominator and the "Total Actual Profit" multiplier of Commerce's standard CEP Profit equation. *See*, *e.g.*, Ta Chen Remand Brief at 13. However, contrary to Ta Chen's

C.  Commerce's Use of Data for Subject Merchandise vs. All Products

Ta Chen's second principal argument turns on its claim that the recognized expenses used in the equation are "impermissibly *company-wide* versus for the *subject merchandise* in particular." Ta Chen Remand Brief at 4.  *See also* Ta Chen Remand Brief at 6 (asserting that Commerce "erroneously uses ['company-wide . . . actual expenses on all products'] as a proxy for [the] costs of the subject merchandise in particular"), 9-10 (arguing that Commerce "failed to calculate the profit on the subject merchandise" and "did not consider imputed credit and inventory carrying costs incurred specifically on the subject merchandise"), 11 (alleging that Commerce "impermissibly uses . . . company-wide costs").[14]

_____

claims, Commerce has not ignored any of the company's costs.  *See* Remand Results at 16; Gov't Remand Brief at 7.

Indeed, in the Remand Results, Commerce expressly acknowledged Ta Chen's relatively high credit and inventory carrying costs.  But, as Commerce observes, there is no apparent reason why all such costs – whatever their magnitude – would not be fully and accurately reflected in Ta Chen's consolidated financial statements.  *See* Remand Results at 9, 12-13, 14.  Ta Chen has failed to advance any such reason (much less to proffer any evidence to substantiate such a claim).  And it is Ta Chen's consolidated financial statements that are the source of the "recognized" figures that the company seeks to avoid.  *See*, *e.g.*, Remand Results at 17, 22.

Moreover, although Ta Chen seems to view "imputed" figures as emanating from some mystical source, they are, in fact, derived directly from "recognized" figures.  *See* Remand Results at 6-7, 12, 16; Dom. Prods. Remand Brief at 3-4.  Ta Chen's claim that Commerce ignored certain of its expenses thus finds no support in the record here.

[14]Ta Chen continues to criticize Commerce's reliance on generally accepted accounting principles.  Ta Chen accuses the agency of improperly invoking accounting principles to justify its use of recognized expenses, which – according to Ta Chen – violates the agency's statutory obligation to calculate dumping margins as accurately as possible.  Ta Chen Remand Brief at 4, 6, 10-12.

This argument, too, reflects a fundamental misconception as to Commerce's methodology.

As Ta Chen correctly points out, its financial statements report its financial expenses related to *all*

of its products – not just those expenses related to subject merchandise. But, contrary to Ta Chen's

implication, Commerce did not use the raw numbers in its CEP Profit equation. Instead, in

accordance with its standard methodology, Commerce calculated the portion of the total net financial

expenses that are reflected in Ta Chen's consolidated financial statements which are attributable to

the subject merchandise. *See* Remand Results at 23-24. Thus, as the Remand Results explain, "the

recognized net financial expenses in the 'Total Actual Profit' multiplier and the 'Total Expenses'

denominator . . . in fact represent a figure *for subject merchandise only*, excluding the appropriate

amounts for any non-subject products." Remand Results at 24 (emphasis added).

## D. Commerce's Test Program

The validity of Commerce's standard methodology as applied to the facts of this case is

buttressed by the results of the test program that the agency ran in the course of the administrative

---

The Government emphasizes that Commerce's standard methodology for calculating CEP Profit is based on the statute, and that the agency's normal practice is to value costs using recognized financial expenses. *See* Gov't Remand Brief at 12-13 (*citing* Remand Results at 5, which in turn cite CEP Profit Policy Bulletin; Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 825 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4164-65). Indeed, the Remand Results state flatly that "the statute indicates that ['Total Actual Profit' and 'Total Expenses'] are to be actual (*i.e.*, recognized) amounts." Remand Results at 5. *But see* SNR Roulements, 402 F.3d at 1361-62 (holding that the statute "does not unambiguously address the issue" of the use of recognized expenses vs. imputed expenses in calculating "Total Expenses").

In any event, Commerce has the discretion to depart from its standard methodology where necessary to achieve a more accurate result. But Ta Chen has failed to establish that any such departure is warranted here. *See* Gov't Remand Brief at 13.

review at issue.  In accordance with Ta Chen I, all documentation related to that test program was

disclosed to Ta Chen and included in the supplemental administrative record compiled on remand.

*See* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1202; Remand Results at 11, 20, Att. A; Draft

Results Pursuant to Remand at Att. I (including both "Log for CEP Test Program" and "Output for

CEP Test Program").

Commerce's test program included Ta Chen's imputed expenses in all parts of the CEP Profit

equation.  *See* Remand Results at 10, 19-20.  Still, the results that the test program yielded did not

differ significantly from the results reached using Commerce's standard methodology.  *See* Remand

Results at 10-11, 21.  The Government highlights this fact as further proof that "Commerce's

standard methodology did not result in a distorted calculation."  Gov't Remand Brief at 8 (*citing*

Remand Results at 21).[15]

---

[15]The Government takes pains to emphasize that the test program "does not represent a
change in practice or an approach which Commerce intends to employ in the future." Gov't Remand
Brief at 8-9; *see also* Remand Results at 10, 12, 21.  The Government characterizes the exercise
instead as "a unique and extraordinary attempt to probe the potential factual basis underlying Ta
Chen's argument, and an effort to resolve Ta Chen's assertions that Commerce's longstanding CEP
profit methodology results in inaccuracies."  Gov't Remand Brief at 8-9.

As the Remand Results explain, "the [alternative] methodology for calculating CEP profit
set forth in [the test program] is flawed":

> According to the Department's [standard] methodology, the imputed interest
> expenses are already reflected in the recognized financial expenses, which [are]
> included in the cost of merchandise in the denominator and the multiplier of the CEP
> profit equation.  By adding the imputed interest expenses to the denominator and the
> multiplier, these amounts are then double-counted in the denominator and in the
> multiplier, such that the denominator and the multiplier would have both the
> recognized amount and the imputed measurement of the respondent's interest
> expenses. Furthermore, the CEP profit equation applied in [the test program] is not
> accurate or symmetrical.  By adding only the U.S. imputed interest expenses, but

Ta Chen attacks Commerce's test program, asserting (a) that there is no evidence that the test program actually ever even "considered, much less adequately [considered], imputed credit and inventory costs," and (b) that – more generally – there must be an error in the test program because there is no great discrepancy between the results yielded by that program and the results of the agency's standard methodology. *See* Ta Chen Remand Brief at 2, 7-9.

The Government argues that Ta Chen's challenges to the test program come too late. In the course of the remand proceedings, Commerce served Ta Chen with copies of both the complete test program and the output log. According to the Government, Ta Chen was obligated to raise all objections to the test program with the agency at that time. The Government maintains that any attempt to raise such concerns now – for the first time – is barred by the doctrine of exhaustion of administrative remedies. *See* Gov't Remand Brief at 9; Remand Results at 20. *See generally* Ta Chen I, 28 CIT at _____, 342 F. Supp. 2d at 1205-07 (discussing doctrine of exhaustion); 28 U.S.C. § 2637(d).

The Government is only about half right. It is true that Ta Chen failed to raise the second (more general) point at the administrative level. But, contrary to the Government's claim, it appears that Ta Chen's comments on the Draft Remand Results in fact did flag the first point (concerning

_____

ignoring the home market imputed interest expenses and any imputed expenses related to production, purchasing, financing, or administrative activities, [the test program] places undue emphasis on Ta Chen's imputed U.S. selling expenses.

Remand Results at 11-12; Dom. Prods. Remand Brief at 5. *See also* Remand Results at 25-26 (cataloguing a few of the "additional adjustments" that would be necessary to remedy flaws in the test program methodology, which "leaves much room for improvement"; even so, Commerce's standard methodology would still "represent[ ] the most accurate methodology").

the test program's use of imputed expenses). Indeed, Ta Chen's comment on that issue precipitated

a response from Commerce in the agency's final Remand Results filed with the Court.[16]

In any event, and more to the point, neither of Ta Chen's arguments is persuasive on the

merits. As the Government puts it, "Ta Chen takes fragments of the test program out of context to

incorrectly argue that imputed costs are not included in Total United States Selling Expenses

('TOTSELLU')." *See* Gov't Remand Brief at 9-10; Ta Chen Remand Brief at 7-8. Ta Chen

apparently examined only a part of the test program. A more comprehensive review of the relevant

parts of the program confirms that Commerce did indeed include Ta Chen's imputed expenses in the

Total Selling Expenses ("TOTSELLU") line item. *See generally* Remand Results at 19-21.[17]

---

[16]*See* Letter to U.S. Sec'y of Commerce from Counsel to Ta Chen (Aug. 9, 2004) at 2
(arguing that, in the Draft Remand Results, "the Department *purports* . . . to recalculate the CEP
Profit adjustment per Ta Chen's arguments that imputed costs must be considered") (emphasis
added); Remand Results at 21 (stating that "the test program did in fact include the U.S. imputed
financial expenses in the 'Total Actual Profit' multiplier and the 'Total Expenses' denominator,
*despite Ta Chen's claims to the contrary*") (emphasis added).

[17]The Remand Results describe the test program in detail:

> As evidenced by the equations set forth in the test program, the Department added
> the imputed expenses to the "Total Expenses" denominator, thus increasing "Total
> Expenses" by the amount of the imputed expenses. [Commerce] also deducted this
> recalculated "Total Expenses," which now includes the imputed expenses, from Ta
> Chen's "Total Revenue" to recalculate the "Total Actual Profit" multiplier. *See* CEP
> Test Program Log at lines 3293-3391. Thus, [Commerce] did in fact increase the
> "Total Expenses" denominator by the amount of the imputed expenses, and . . . also
> did in fact decrease "Total Actual Profit" multiplier by including the same imputed
> expenses as a deduction from "Total Revenue." . . . .
>
> . . . . As evidenced from the actual calculations in the CEP test program and the test
> program computer language, the test program did in fact include the U.S. imputed
> financial expenses in the "Total Actual Profit" multiplier and the "Total Expenses"
> denominator, despite Ta Chen's claims to the contrary.

Equally lacking in substance is Ta Chen's claim that the relatively insignificant change in the results yielded by the test program somehow "defies mathematical logic" and constitutes proof of some fundamental error. *See generally* Ta Chen Remand Brief at 2, 8-9. Apart from its general expressions of skepticism and incredulity, Ta Chen largely fails to elucidate this point, or to proffer any real evidence to support it.

As the Government observes, "The test program resulted in a difference of 6.5% in the total United States selling expenses. This, in turn, [would] lower[ ] Ta Chen's margin slightly." Gov't Remand Brief at 10 (*citing* Remand Results at 11). According to the Government, the difference in results between the test program and the application of the agency's standard methodology – however modest that difference may be in Ta Chen's eyes – itself constitutes "evidence that Commerce did in fact add imputed expenses to two parts of the calculation." Gov't Remand Brief at 10-11.

Notwithstanding its various criticisms of the test program, Ta Chen seeks to avail itself of the program's results. Specifically, Ta Chen argues that, at a minimum, the results of the test program "confirmed that it *does* make a difference in the dumping margin to consider imputed expenses on U.S. sales" in calculating CEP Profit. Ta Chen Remand Brief at 2-3. Emphasizing that the statute and judicial precedent require that dumping margins be calculated as accurately as possible, Ta Chen apparently contends that its dumping margin must be recalculated to reflect the test program results: "The statute does not say that minor inaccuracies may be ignored." Ta Chen

_____

Remand Results at 20-21; *see also* Gov't Remand Brief at 10.

Remand Brief at 2-3, 15-16 (*citing* D & L Supply Co. v. United States, 113 F.3d 1220, 1223 (Fed.

Cir. 1997)).

But Ta Chen's claim is wide of the mark, and must be rejected. As detailed in note 15 above,

the test program has a number of inherent flaws. *See generally* Remand Results at 11-12, 21, 25-

26.[18] Thus, there can be no suggestion that the test program is more accurate than Commerce's

standard methodology. *See* Remand Results at 25.

E.  Commerce's Departure from
Its Standard Methodology in Other Cases

Ta Chen continues to emphasize that there are other cases where Commerce has deviated

from its standard methodology for calculating CEP Profit. Ta Chen urges that the same course

should be followed here. *See generally* Ta Chen Remand Brief at 14-16.[19]

---

[18]In the Remand Results, Commerce noted – as an aside – that, in the event that one were to consider actually relying on the approach employed in the test program, numerous refinements and adjustments would be necessary. *See* Remand Results at 11-12, 25-26. Ta Chen pounces on the agency's observations, dismissing them as mere "speculation without record support." Ta Chen Remand Brief at 8. To the contrary, the points that Commerce makes are well-reasoned and clearly articulated, and (among other things) further illuminate the deficiencies in Ta Chen's proposed alternative approach to the calculation of CEP Profit.

[19]It has become increasingly unclear precisely how Ta Chen would propose to calculate CEP Profit. Although Ta Chen now denies advocating the use of TCI's financial statements, it appears that, in fact, it has urged exactly that in the past. *Compare* Ta Chen Remand Brief at 9 (asserting that it is not proposing use of TCI's financial statements) *with* Ta Chen Memorandum of Law In Support of Motion For Judgment On the Agency Record (Sept. 4, 2001) at 28 (arguing for use of "TCI's relevant financial statement ending October 31, 1998").

As the Remand Results detail, however, any such use of TCI's financial statements would pose a panoply of problems. *See generally* Remand Results at 16-17, 21-23. As Commerce explains, it would be inappropriate for the agency to "rely on the individual financial statements of a single subsidiary [*i.e.*, TCI] to reflect the full financial results and position of the consolidated

But the cases that Ta Chen invokes are anomalies. *See generally* Gov't Remand Brief at 11-

12. In each of those cases, Commerce departed from its standard methodology only because it was

required to do so by the court – *not* because the agency viewed the alternative methodology as more

accurate.[20] In each of those cases, although Commerce complied with the court's directive, the

_____

correspondent [*i.e.*, Ta Chen]." *Id*. at 17. For example, because TCI "sells a full range of products
which are outside the scope of [the] [antidumping] order [at issue], and has significant related-party
transactions with other Ta Chen companies," there is no basis for treating TCI's financial statements
as though they "effectively isolate the proper portion of Ta Chen's recognized financial expenses that
may be attributable to U.S. selling activities of subject merchandise." *Id*. at 17, 23. For this reason,
and others, "[n]either [Commerce] nor the Court has contemplated using TCI's recognized financial
expenses as a substitute for Ta Chen's recognized financial expenses or as a substitute for Ta Chen's
imputed financial expenses." *Id*. at 23; *see also id*. at 17.

Further, as the Remand Results note, Ta Chen has previously argued that "Ta Chen had large
imputed financial expenses for U.S. selling activities, yet that TCI had very little recognized interest
expense during the [period of review]." Remand Results at 23 (citation omitted). As Commerce
observes, "[t]his suggests that any recognized financing expenses related to imputed credit or
inventory carrying costs are not being borne by TCI, but rather by the parent company [Ta Chen] or
other Ta Chen companies. Such amounts are not reported in TCI's separate financial statements, but
would be reflected in Ta Chen's consolidated statements." *Id*.

Most recently, Ta Chen has suggested that – to avoid the "double counting" that results from
including both imputed and recognized numbers in the same parts of the equation (a phenomenon
that Ta Chen apparently now concedes) – Commerce "need only include imputed and not recognized
expenses" in all parts of its CEP Profit equation. Ta Chen Remand Brief at 8. But it is far too late
in the day to start vetting new proposed alternative methodologies. In any event, Commerce's
preference for the use of actual, recognized, "booked" figures, where available (rather than imputed
figures), is entirely reasonable and in accordance with generally accepted accounting principles. *See*,
*e.g.*, The Timken Co., 26 CIT at 1090, 240 F. Supp. 2d at 1246 (*citing* Antidumping Manual). *Cf*.
The Thai Pineapple Public Co. v. United States, 187 F.3d 1362, 1366 & n.5 (Fed. Cir. 1999). Absent
some showing that Commerce's use of recognized figures in its CEP Profit calculations improperly
skews the results, there is no basis for requiring the agency to use some other set of data. Certainly
Ta Chen has made no such showing here.

[20]*See* NTN Bearing Corp. of America v. United States, 25 CIT 664, 155 F. Supp. 2d 715
(2001); FAG Kugelfischer Georg Schafer AG v. United States, 25 CIT 74, 131 F. Supp. 2d 104

agency respectfully objected to the departure from its standard methodology.[21] And, in each of those cases, the agency prevailed on appeal. *See* SNR Roulements, 402 F.3d 1358; FAG Italia S.p.A. v. United States, 402 F.3d 1356 (Fed. Cir. 2005).[22] *See generally* Gov't Remand Brief at 11-12.

Indeed, Ta Chen itself has been down this road before. Another court has previously rejected basically the same arguments that Ta Chen presses here, in a case in which Ta Chen challenged a different administrative review of the same underlying antidumping order at issue in this action. *See generally* Alloy Piping Prods. Co. v. United States, 28 CIT ____, 2004 WL 2418314 (2004); Ta Chen Remand Brief at 4 n.3 (acknowledging that Ta Chen raised same challenges to Commerce's standard CEP Profit calculation methodology both in instant case and in Alloy Piping). In Alloy Piping, the court sustained Commerce's application of its standard CEP Profit calculation

---

(2001); FAG Italia, S.p.A. v. United States, 24 CIT 1311 (2000); SNR Roulements v. United States, 24 CIT 1130, 118 F. Supp. 2d 1333 (2000).

[21]The Government summarizes some of Commerce's concerns about its departures from its standard methodology in the three (outdated) cases on which Ta Chen relies:

> Commerce respectfully objected to the court-ordered methodology because the change distorted the ratio of United States selling expenses to total expenses. A distortion was created because the addition of imputed expenses incurred upon sales of the subject merchandise in the United States does not result in the addition of imputed expenses incurred upon sales of foreign like product sold in the exporting country. This overstatement of costs understates the ratio of United States selling expenses to total expenses and, thus, understates the amount of actual profit allocated to selling, distribution, and further manufacturing activities in the United States.

Gov't Remand Brief at 11-12.

[22]Obviously, these decisions by the Court of Appeals also dispose of Ta Chen's claim that judicial precedent mandates the inclusion of imputed expenses in all parts of the CEP Profit equation. *See* Ta Chen Remand Brief at 13-16.

methodology, because Ta Chen was unable to demonstrate that imputed expenses were not adequately reflected. Alloy Piping, 28 CIT at ____, 2004 WL 2418314 at * 5. So too Ta Chen has failed to demonstrate that imputed expenses were not properly reflected in Commerce's CEP Profit calculations in the case at bar.

In sum, pursuant to Ta Chen I and in accordance with the Court of Appeals' holding in SNR Roulements, Ta Chen has been accorded more than ample opportunity to demonstrate that – under the facts of this case – the Commerce Department's use of actual, recognized expenses in the calculation of "Total Expenses" and "Total Actual Profit" did not fully account for U.S. credit and inventory carrying costs. *See* Ta Chen I, 28 CIT at ____, 342 F. Supp. 2d at 1199-1203; SNR Roulements, 402 F.3d at 1361, 1363. Yet Ta Chen has pointed to nothing in the record that casts doubt on the agency's determination that its standard methodology for calculating CEP Profit (including the use of recognized figures) remains "the most accurate methodology." *See* Remand Results at 25. Under the circumstances, Commerce was well within its rights to decline to depart from that methodology.

### III. <u>Conclusion</u>

For all the reasons set forth above, the Final Results Pursuant to Remand filed by the Department of Commerce in this action are sustained. Judgment will enter accordingly.

_____/s/_____
Delissa A. Ridgway
Judge

Decided:   April 6, 2006
              New York, New York